IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JOHN S.,[1]
     Plaintiff,

       v.                                       Civil No. 3:20-cv-00940 (JAG)

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,
     Defendant.

## REPORT AND RECOMMENDATION

This is an action seeking review of the decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying Plaintiff's application for a period of disability, disability insurance benefits, and supplemental security income under the Social Security Act (the "Act"). Plaintiff was forty-four-years-old at the time of his applications and previously worked as a computer programmer analyst. (R. at 196, 218.) He alleges he is unable to work due to psoriatic arthritis, gouty arthritis, osteo arthritis, early stages of degenerative disc disease, acute depression, memory issues, developing cognitive issues, high blood pressure, hypertension, and diabetes. (R. at 216-17.)

On June 3, 2020, an Administrative Law Judge ("ALJ") issued a decision finding Plaintiff not disabled. (R. at 17-33.) This matter comes before the Court for a Report and Recommendation

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment, rendering the matter ripe for review.[2]

For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion for Remand (ECF No. 25) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 27) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

On March 7, 2018, Plaintiff filed an application for a period of disability, disability insurance benefits, and supplemental security income, alleging a disability onset date of October 1, 2017. (R. at 196.) The SSA denied Plaintiff's claim on July 24, 2018, and again upon reconsideration on September 24, 2019. (R. at 90-113, 114-137.) At Plaintiff's request, the ALJ held an administrative hearing on May 20, 2020, at which Plaintiff and a vocational expert testified. (R. at 39-71, 193-94.) At the hearing, Plaintiff amended his alleged disability onset date to July 24, 2018. (R. at 20, 43-44.) On June 3, 2020, the ALJ issued a written opinion, holding Plaintiff was not disabled under the Act. (R. at 20-33.)

Plaintiff requested review of the ALJ's decision, and on October 16, 2020, the SSA Appeals Council denied it, rendering the ALJ's decision as the final decision of the Commissioner. (R. at 1-6.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g) and 1383(c).[3]

---

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Report and Recommendation, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

[3] 42 U.S.C. § 1383(c)(3) renders the judicial review provisions of 42 U.S.C. § 405(g) fully applicable to claims for supplemental security income.

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does

3

not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must determine the claimant's residual functional capacity, accounting for the most the claimant can do despite his physical and mental limitations. §§ 404.1545(a), 416.925(a).

At step four, the ALJ assesses whether the claimant can perform his past work given his residual functional capacity. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 2012 U.S. App. LEXIS 128, at *3 (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. §§ 416.920(e), 404.1520(e). However, if the claimant cannot perform her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III. FACTUAL BACKGROUND

The ALJ considered Plaintiff's background, medical evidence, and testimony when deciding to deny Plaintiff's disability claim.

#### A. Plaintiff's Background.

Plaintiff was forty-four-years-old at the time of his current benefits application. (R. at 196.)[4] Plaintiff completed three years of college and previously worked as a software programmer and software analyst. (R. at 67, 98, 108, 217.) Plaintiff began working part-time as a pizza delivery driver on June 8, 2018. (R. at 45-46, 50-51.) Plaintiff alleges he is limited in his ability to work due to reduced energy levels, difficulty remembering and understanding information, and pain and cramping in his hands, legs, arms, torso, back, and neck. (R. at 46-47, 52-53, 55-56, 216-17.)

#### B. Medical Evidence.

Plaintiff has a documented history of obesity, osteoarthritis, fibromyalgia, asthma, neuropathy, gouty arthropathy, psoriatic arthritis, depression, chronic pain syndrome, lumbosacral spondylosis without myelopathy, thoracic spondylosis without myelopathy, type two diabetes mellitus, and chronic kidney disease. (R. at 77, 266, 279, 372-73, 456.) Plaintiff received regular treatment for these conditions during the relevant period, including pain management treatment and prescription medication regimens. (R. at 427-32, 502-07.) His pain treatments for several conditions included hydrocodone and spinal injections. (*See, e.g.*, R. at 339-47.) Plaintiff routinely reported no side effects from the hydrocodone prescriptions and endorsed improved functioning when taking the medication. (R. at 510, 561.)

---

[4] Plaintiff previously filed a benefits application on May 7, 2015, and was denied benefits. (R. at 72-85.)

From April 2017 to February 2020, Plaintiff reported fatigue to physicians on approximately thirty occasions during appointments for various conditions. (R. at 267, 336, 341, 354, 374, 387, 392, 409, 422, 435, 442, 470, 475, 480, 484, 489, 510, 518, 523, 533, 544, 550, 554, 560, 564, 569, 638, 646, 651, 657.) Plaintiff reported no fatigue on eight occasions. (R. at 430, 573, 591, 597, 603, 610, 616, 662.) He treated for fatigue twice, and his providers discerned four potential causes: (1) a thyroid irregularity; (2) a vitamin B12 deficiency; (3) fibromyalgia; or (4) a side effect of Plaintiff's medications. (R. at 485, 489.)

On April 19, 2019, Plaintiff underwent laboratory testing, which indicated his thyroid function and vitamin B12 levels were within normal limits. (R. at 493-96.) As a result of the laboratory testing on April 19, 2019, John W. Lewis, Jr., D.O. ("Dr. Lewis") diagnosed Plaintiff with stage four chronic kidney disease and referred him to a specialist. (R. at 476-81, 493-96, 456-58.) From April 2019 to July 2019, Dr. Lewis primarily treated Plaintiff's kidney disease and modified his prescriptions for other conditions as a result of it. (R. at 468-81.) Plaintiff's chronic kidney disease was primarily managed with diet. (R. at 453-58, 475.)

From July 2019 to December 2019, Plaintiff reported memory loss to physicians on five occasions. (R. at 597, 603, 610, 616, 623.) In two general examinations of Plaintiff's psychiatric health during primary care visits, Dr. Lewis found that Plaintiff's recent memory and remote memory were normal. (R. at 484, 489.)

**C. Plaintiff's Testimony.**

During the administrative hearing, Plaintiff testified that he was unable to work due to reduced energy levels, difficulty remembering and understanding information, and pain and cramping in his hands, legs, arms, torso, back and neck. (R. at 46-47, 52-53, 55-56.) Plaintiff testified that he could not: (1) stand for more than thirty minutes on a good day or more than five

minutes on a bad day; and (2) sit for more than two hours on a good day or thirty minutes on a bad day, depending upon his pain level. (R. at 57-59.) Plaintiff testified that he had trouble walking, as well as gripping and lifting heavy items. (R. at 52-53, 56-59, 63.)

Moreover, Plaintiff told the ALJ that he regularly experienced fatigue and memory issues. (R. at 46-47, 52, 62-63.) As a result, he usually needed to take naps during the day, and that performing chores like vacuuming or basic household tasks required him to take breaks to sit or nap. (R. at 62-63.) Further, he explained that his fatigue limited his ability to work for continuous periods, such as his delivery shifts, which were limited to four hours. (R. at 62.) Plaintiff also testified: (1) to having difficulty with remembering, maintaining attention and concentration, and understanding information; and (2) that his memory issues can make it hard for him to recall words and maintain his "train of thought." (R. at 47, 51, 52.) He told the ALJ that his fatigue and memory struggles were caused by fibromyalgia "and everything else compounding with it." (R. at 47.)

Finally, Plaintiff testified that his stage four chronic kidney disease did not require dialysis and that he was not expected to require it in the future. (R. at 53.) Plaintiff added that he managed his kidney disease through a healthy diet. (R. at 53.) In regard to his type two diabetes mellitus, Plaintiff testified his glucose levels were stable and that he managed it through diet. (R. at 53-54.)

**D.  The Vocational Expert's Testimony.**

In addition to Plaintiff, a vocational expert testified before the ALJ at the administrative hearing. (R. at 64.)  The vocational expert listened to Plaintiff's testimony regarding his work history and testified that Plaintiff's past work was classified as a composite job between two roles (a software programmer and a software analyst), both of which are skilled positions. (R. at 64-67.) The ALJ then posed a series of hypothetical questions to the vocational expert regarding the work-related abilities of a person with Plaintiff's same age, education, and limitations. (R. at 67-70.)

In the first hypothetical, the ALJ provided several physical restrictions, including standing or walking for six hours in an eight-hour workday, and mental limitations, including work that could be understood, remembered, and carried out with simple and routine instructions, two hours of concentration on tasks, and occasional independent decision-making. (R. at 67-68.) The vocational expert testified that a worker would not be able to perform Plaintiff's past skilled work under the hypothetical provided. (R. at 68.) However, the vocational expert provided examples of available jobs in the national economy that would be consistent with the hypothetical limitations. (R. at 68.) Specifically, she identified the following unskilled occupations at the light exertional level: (1) storage facility rental clerk (42,800 available positions in the national economy); (2) router (53,300 available positions in the national economy); and (3) cafeteria attendant (66,100 available positions in the national economy). (R. at 68.)

In the second hypothetical, the ALJ stipulated the same hypothetical as the first, but modified it to reflect an individual's ability to stand or walk for two hours in an eight-hour workday. (R. at 68-69.) The vocational expert confirmed that an individual would be unable to do the jobs she identified at the light exertional level but would have other work at the sedentary level. (R. at 69.) She provided the following examples of representative occupations available to a hypothetical individual with the ALJ's second hypothetical limitations: (1) addresser (4,600 jobs in the national economy); (2) credit clerk (4,600 jobs in the national economy); and (3) information clerk (3,600 jobs in the national economy). (R. at 69.)

The ALJ provided a third hypothetical that repeated the limitations provided for in the second, but with the limitation that the individual could "only frequently understand, remember, and carry out simple and routine work-related instructions." (R. at 69-70.) The vocational expert

affirmed that she could not identify any competitive employment for this hypothetical individual, nor for an individual who "would miss work two times a month or more unpredictably." (R. at 70.)

## IV. THE ALJ'S DECISION

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since July 24, 2018 (the amended alleged onset of his disability). (R. at 23.) At step two, the ALJ found that Plaintiff had the following severe impairments: obesity, psoriatic arthritis, osteoarthritis, fibromyalgia, chronic pain syndrome, thoracic spondylosis without myelopathy, lumbosacral spondylosis without myelopathy, asthma, and neuropathy. (R. at 23.) The ALJ found that these severe impairments significantly limited Plaintiff's ability to perform work-related activities. (R. at 23.) The ALJ found the following impairments non-severe: type two diabetes mellitus, chronic kidney failure, hypertension, gout, anxiety, and depression. (R. at 23-24.)

At step three, the ALJ determined that Plaintiff's medically determinable impairments did not meet or medically equal the severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 26.) Specifically, the ALJ held that Plaintiff's impairments did not meet or equal Listings 1.00, 3.00, 11.00, and 14.00. (R. at 26.)

Between steps three and four, the ALJ determined Plaintiff's residual functional capacity based on an evaluation of the evidence, which included Plaintiff's medical records, testimony, and the medical opinion evidence. (R. at 20-33.) Based on his review of this evidence, the ALJ determined that Plaintiff retained the ability to perform light work with the following limitations:

> [Plaintiff] is able to stand and/or walk two hours in an eight-hour workday. [Plaintiff] is also able to occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, frequently balance, occasionally stoop, occasionally kneel, occasionally crouch, occasionally crawl, occasionally tolerate exposure to environmental extremes of heat, cold, or humidity, unable to tolerate exposure to hazards such as unprotected heights or moving machinery, and frequently but not constantly able to handle, finger, and feel.

> [Plaintiff] is further able to understand, remember and carry out simple and routine work-related instructions and concentrate on work-related tasks for periods of two hours. [Plaintiff] is able to perform non-production pace/non-assembly line pace work that involves no more than occasional workplace changes or occasional independent decision-making and no responsibility for the safety of others.

(R. at 26.) The ALJ explained that he made this determination after considering Plaintiff's severe and non-severe medically determinable impairments. (R. at 31.)

Based on this determination, the ALJ concluded at step four that Plaintiff was unable to perform any of his past relevant work. (R. at 31.) At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. at 32-33.) In making his findings, the ALJ considered the testimony of the vocational expert, who opined that given Plaintiff's age, education, work experience, and residual functional capacity, he would be capable of performing the requirements of representative occupations in the national economy, such as addresser (4,600 jobs nationally), credit clerk (4,600 jobs nationally), and information clerk (3,600 jobs nationally). (R. at 32.) Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act. (R. at 33.)

## V. ANALYSIS

Plaintiff argues three issues necessitate remand or a directed calculation of benefits. (Pl.'s Mem. Supp. Mot. Summ. J. 8-12, ECF No. 26 ("Pl.'s Mem.").) First, Plaintiff alleges that the ALJ erred when he classified Plaintiff's diabetes, kidney disease, and fatigue as non-severe impairments. (Pl.'s Mem. at 8-9.) Second, Plaintiff contends that the ALJ erroneously failed to account for these non-severe impairments, as well as his memory problems and fatigue, when crafting the residual functional capacity. (Pl.'s Mem. at 8-10.)  Third, Plaintiff argues that the

representative occupations identified by the vocational expert "do not exist in substantial enough numbers for [Defendant] to meet her burden at step five of the evaluation." (Pl.'s Mem. at 10-12.)

Defendant responds that the ALJ's decision should be affirmed because: (1) substantial evidence supports the ALJ's finding that Plaintiff's diabetes, kidney disease, and fatigue were non-severe, and the impairments were incorporated into the residual functional capacity; (2) the ALJ accounted for Plaintiff's non-severe impairments, fatigue, and memory loss in the residual functional capacity; and (3) the ALJ did not err at step five and his analysis was done in accordance with the regulations and relevant case law. *See* 20 C.F.R. §§ 404.1566(b), 416.966(b). (Def.'s Mot. Summ. J. Br. Supp. 11-21 ECF No. 27 ("Def.'s Mem.").)

### A. The ALJ Did Not Err in Finding Plaintiff's Diabetes, Chronic Kidney Disease, and Fatigue to be Non-Severe Impairments.

Plaintiff first argues that the ALJ erred in classifying Plaintiff's diabetes, chronic kidney disease, and fatigue as non-severe impairments, which resulted in an inaccurate residual functional capacity. (Pl.'s Mem. at 8.) In support, Plaintiff notes that the ALJ's reasoning for finding Plaintiff's diabetes non-severe overlooked Plaintiff's "high glucose levels, high A1C score," and the ALJ's admission that Plaintiff's glucose levels were "not as well controlled" as they should be. (Pl.'s Mem. at 9.) Further, Plaintiff argues that his diabetes and chronic kidney disease contribute to his fatigue, which limits his ability to work full-time. (Pl.'s Mem. at 9.) Defendant responds that Plaintiff's diabetes and kidney disease were stable with treatment, and that "Plaintiff received almost no treatment for complaints of fatigue. Most references to fatigue are self-reports that have no corresponding treatment." (Def.'s Mem. at 5) (capitalized text omitted.) Thus, according to Defendant, the ALJ did not err in finding these impairments non-severe, and, even if he did, such error is harmless because the ALJ moved past step two and "fully considered the medical evidence

and Plaintiff's allegations in his residual functional capacity assessment." (Def.'s Mem. at 15.) For the reasons stated below, the Court finds the ALJ did not err in his step two findings.

      *1. Legal Standard.*

      At step two, an ALJ must consider a claimant's medically determinable impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1521, 416.920(a)(4)(ii), 416.921. "The Supreme Court has held that this step of the disability evaluation is a *de minimis* threshold." *Williams v. Astrue*, 2010 WL 395631, at *14 (E.D. Va. Feb. 2, 2010), *report and recommendation adopted*, at *1 (citing *Bowen v. Yuckert*, 482 U.S. 137, 146-47 (1987)). An ALJ satisfies step two by finding a severe impairment and proceeding through the rest of the sequential analysis. *See McCormick v. Soc. Sec. Admin.*, *Comm'r*, 619 F. App'x 855, 858 (11th Cir. 2015); *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) ("[T]he finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two.")  A claimant has the burden of demonstrating that he has an "impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c); *Bowen*, 482 U.S. at 146.  The claimant's impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. §§ 404.1509, 416.909.

      A severe impairment causes more than a minimal effect on one's ability to work. §§ 404.1520(c), 416.920(c).  "[A]n impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (citing *Brady v. Heckler*, 724 F.2d 914, 920

(11th Cir. 1984)). In other words, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [one's] physical or mental ability to do basic work activities." §§ 404.1522(a), 416.922(a). An ALJ will find a claimant not disabled at step two if he "do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . , or a combination of impairments that is severe and meets the duration requirement." §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

Further, under 20 C.F.R. § 404.1523, the ALJ must consider the combined effect of all of a claimant's impairments "without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. "Thus, the issue of whether or not a particular impairment is found severe is only critical if the ALJ finds no severe impairment and ends the analysis at step two; if any impairment is severe, the ALJ must consider all impairments when assessing residual functional capacity." *Miller v. Astrue*, No. 8:10-1142-HMH-JDA, 2011 U.S. Dist. LEXIS 45262, 2011 WL 1576203, at *15 (D.S.C. Apr. 7, 2011). Consequently, any error by an ALJ at step two is harmless if the ALJ considers the effects of all of the claimant's impairments in the subsequent steps. *See Brooks v. Astrue*, No. 5:10CV00104, 2012 U.S. Dist. LEXIS 41295, 2012 WL 1022309, at *12 (W.D. Va. Mar. 26, 2012) (citing *Miller*, 2011 U.S. Dist. LEXIS 45262, 2011 WL 1576203, at *15); *see also Gaskins v. Comm'r*, No. WDQ-13-1470, 2014 U.S. Dist. LEXIS 31710, 2014 WL 979205, at *5 (D. Md. March 12, 2014); *Hammond v. Astrue*, No. TMD 11-2922, 2013 U.S. Dist. LEXIS 29730, 2013 WL 822749, at *2 (D. Md. March 5, 2013) (collecting cases).

>    2.  *Substantial evidence supports the ALJ's finding that Plaintiff's diabetes was not severe.*

Plaintiff argues that the ALJ erred in finding Plaintiff's diabetes to be a non-severe impairment because the medical record "indicate[d] that [Plaintiff's] type 2 diabetes was stable"

and did not significantly limit Plaintiff's ability to perform basic work activities. (R. at 23-24, citing R. at 455, 458.) In alleging error, Plaintiff challenges the ALJ's conclusion that his diabetes was stable by pointing to his "high glucose levels, high A1C score, and the ALJ's own statement/question that [Plaintiff's] glucose levels were stable 'but not, not as well controlled, as it needs to be.'" (Pl.'s Mem. at 9.)

First, the ALJ considered Plaintiff's testimony that his diabetes was stable and managed with a proper diet. (R. at 53-54, 60.) Specifically, Plaintiff testified that his glucose levels at the time of the hearing were "stable, but not nearly as low as either Dr. Lewis or [Plaintiff] want them to be and that's something we're continuing to work on." (R. at 54.) When the ALJ affirmed, "So, reasonably stable, but not, not as well controlled, as it needs to be," Plaintiff replied, "Correct. And that's just the process we're working through right now." (R. at 54.)

Second, a review of Plaintiff's medical record supports the ALJ's determination that Plaintiff's diabetes had been stabilized. At an appointment on April 24, 2019, a physician noted that Plaintiff's "[d]iabetic control has been reasonably good as per patient." (R. at 456.) Additional records also show that Plaintiff's diabetes was being treated with glipizide, a medication which Plaintiff testified he continued to take at the time of the administrative hearing on February 26, 2020. (R. at 60, 455, 458.)

Third, the objective medical evidence supports the ALJ's determination that Plaintiff's diabetes was non-severe. Specifically, the A1C score to which Plaintiff cites was from a laboratory test reviewed by Plaintiff's physician, who charted that Plaintiff's type two diabetes was stable. (Pl.'s Mem. at 4; R. at 493-95, 455-58.) Plaintiff does not point to other evidence that indicated how diet and medication management of the condition significantly limited his ability to perform basic work activities, apart from concluding that the condition causes Plaintiff to become fatigued.

14

(Pl.'s Mem. at 9.) Consequently, substantial evidence supports the ALJ's determination that Plaintiff's diabetes was not severe.

> 3. *Substantial evidence supports the ALJ's finding that Plaintiff's kidney disease was not severe.*

Plaintiff briefly alleges, without developing his argument, that the ALJ erred in finding his chronic kidney disease to be non-severe. (Pl.'s Mem. at 8.) The ALJ reasoned that Plaintiff's medical treatment records from April 2019 through May 2019 showed he "had improved renal function and improved hemodynamics." (R. at 23.) On April 24, 2019, Plaintiff was referred to a nephrologist and treated for renal failure following laboratory testing performed on April 19, 2019. (R. at 456-58.) The nephrologist instructed Plaintiff to discontinue ibuprofen and to adhere to a potassium-restricted diet. (R. at 456-58.) Plaintiff was hospitalized from May 5, 2019, through May 7, 2019, for an acute kidney injury and chronic kidney disease. (R. at 453, 468.) However, his creatinine improved during and following hospitalization, and Plaintiff began adhering to the above-prescribed regimen. (R. at 453-58.) The nephrologist's notes from the second appointment on May 15, 2019, indicate that Plaintiff was advised to schedule a follow up appointment in one month; however, Plaintiff's medical records do not include any further appointments with the specialist documenting treatment for his chronic kidney disease. (R. at 452-55.)

In evaluating the objective medical evidence, the ALJ noted "[Plaintiff] also appeared in no distress with normal heart sounds, no murmurs or rubs, a soft and nontender abdomen, no renal angle tenderness, no edema of the extremities, a normal gait, and normal skin." (R. at 23.) He also summarized Plaintiff's objective complaints, noting that at the hearing Plaintiff claimed his condition was not progressing but "denied receiving dialysis and [] testified that he manage[d] his kidney function . . . with his diet." (R. at 24, citing R. at 53.)  As mentioned above, Plaintiff failed to fully develop his argument that the ALJ erred in finding his kidney disease to be non-severe.

(Pl.'s Mem. at 9.) Even if Plaintiff sufficiently developed his argument, the undersigned finds that substantial evidence supports the ALJ's findings that Plaintiff's kidney disease non-severe because it was controlled by treatment.

4.  *Substantial evidence supports the ALJ's evaluation of Plaintiff's fatigue.*

Finally, Plaintiff alleges that the ALJ should have found his fatigue to be a severe impairment, and "compounded his step two error by failing to adequately consider [it] at the later steps in the sequential analysis." (Pl.'s Mem. at 8.) As noted above, the SSA regulatory code makes clear the requirements to meet the threshold of severe impairment: "[a]n impairment or combination of impairments is not severe if it does not significantly limit . . . physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521. Importantly, "pain or other symptoms will not alone establish that you are disabled." 20 C.F.R. § 404.1529(a). Instead, "there must be medical signs and laboratory findings which show . . . medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged . . . ." *Id.* The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment.

Following the above framework, the ALJ correctly analyzed Plaintiff's fatigue, not as a separate impairment, but as a symptom. (R. at 31) ("Appropriate mental limitations have also been included to accommodate [Plaintiff's] reports of memory issues, cognitive issues, and word finding difficulty related to the fibromyalgia.") Indeed, even Plaintiff acknowledges that his fatigue was likely a symptom of "fibromyalgia and other medical conditions" that caused him to have decreased energy levels and nap frequently. (Pl.'s Mem. at 10.)  The record indicates that his providers also questioned the cause of his fatigue, and whether it was a symptom of his fibromyalgia or a side effect of his medications. (R. at 485) ("This could be fatigue related to the fibromyalgia and/or medicines.") Likewise, the ALJ considered Plaintiff's medications and

16

concluded that "the record does not contain complaints related to ongoing medication side effects and there is no indication of significant medication adjustments to accommodate any reported side effects. For instance, during examinations from June 2019 to December 2019, the claimant denied any medication side effects." (R. at 29) (internal citations omitted.) Indeed, the record indicates that Plaintiff reported improvement in pain levels and functioning with medication use, and no side effects. (R. at 331, 468-81, 519, 530, 632.)

Thus, it was reasonable for the ALJ to conclude that Plaintiff's "statements about the intensity, persistence, or functionally limiting effects" of Plaintiff's reported symptoms "are not entirely consistent with the medical evidence and other evidence in the record . . . ." (R. at 27.) A review of the medical evidence shows that Plaintiff reported fatigue to Dr. Lewis on July 17, 2018. (R. at 489.) On March 20, 2019, Dr. Lewis again treated Plaintiff for fatigue and identified four potential causes: fibromyalgia, thyroid irregularity, vitamin B12 deficiency, and a side effect of medication. (R. at 485.) Laboratory results performed on April 19, 2019, revealed normal thyroid function and vitamin B12 levels. (R. at 493-96.) In other medical records, Plaintiff notably denied fatigue or malaise. (R. at 28; *see* R. at 430, 573, 591, 597, 603, 610, 616, 623.)

In addition to the medical records, the ALJ noted Plaintiff's subjective complaints about his fatigue, specifically that he had to "lie down after only twenty minutes of mildly stimulating work such as vacuuming the floor and he naps daily for approximately two to three hours." (R. at 27.) The ALJ found that Plaintiff's "activities of daily living are also inconsistent with the level of complaints alleged." (R. at 29.) For instance, the ALJ wrote that Plaintiff "prepares meals and performs household chores including laundry, washing dishes, vacuuming, and performing household repairs." (R. at 29.) Plaintiff also "drives, watches television, reads, listens to music, plays video games, and spends time on the computer online shopping. In addition, [Plaintiff]

reported that he spends time with others, goes grocery shopping, and attends his scheduled appointments." (R. at 29.) Further, the ALJ noted that Plaintiff worked as a part-time delivery driver for ten to eighteen hours per week, which indicated his ability to function despite his fatigue. (R. at 23, 25.)

The undersigned finds that it was reasonable for the ALJ to find that Plaintiff's fatigue was not a severe impairment. After considering Plaintiff's background, medical evidence, and testimony, the ALJ determined there was insufficient evidence to demonstrate that Plaintiff's fatigue significantly inhibited his functional capacity to perform work-related activities. (R. at 24.) Nonetheless, the ALJ's residual functional capacity accounted for the mental limitations Plaintiff experienced as a result of fatigue. Thus, even if it was error not to find fatigue, on its own, to be a severe, medically determinable impairment, such error would be harmless. (R. at 24, 31; *see Ferrebee v. Saul*, No. 1:19CV1139, 2021 U.S. Dist. LEXIS 22142, 2021 WL 410886, at *5 (M.D.N.C. Feb. 5, 2021).) Upon review of the evidence and the ALJ's decision, the undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff's diabetes, chronic kidney disease, and fatigue were non-severe impairments.

**B. The ALJ Did Not Err in Assessing Plaintiff's Residual Functional Capacity.**

Plaintiff next asserts that the ALJ's residual functional capacity failed to account for the impact of Plaintiff's fatigue on his ability to: (1) understand, remember, and apply information; and (2) maintain attendance pace, and persistence. (Pl.'s Mem. at 9-10.) Defendant argues that "there are no treatment records for Plaintiff's alleged memory issues," nor is there evidence that Plaintiff had difficulty in remembering his doctors' instructions or attending appointments. (Def.'s Mem. at 18.) Defendant adds that Plaintiff did not seek additional treatment for his alleged fatigue and was capable of working as a delivery driver during the relevant period. (Def.'s Mem. at 18.)

At the outset, Plaintiff's supporting memorandum contains sparse support for his argument and appears to be an invitation for this Court to impermissibly re-weigh the evidence in Plaintiff's favor. For instance, in support for his argument that the ALJ erred, Plaintiff merely cites to statements he made in response to questions from his attorney at the hearing testimony, in which he explained that he could "go [a]bout four hours before my energy levels started dropping too badly. After five hours, it's usually close to a point where I'm about to pass out." (Pl.'s Mem. at 10, citing R. at 62.) Additionally, Plaintiff noted that he told the ALJ that he needed to nap every day, especially after activities such as vacuuming the floor, and that his boss "was very understanding and allow[ed] [him] to work around [the fatigue] as far as [he] could physically do it." (Pl.'s Mem. at 10, citing R. at 62.)

The Court's role is to determine whether substantial evidence exists in the record to support the ALJ's final decision, and whether the ALJ employed the correct legal standard in reaching that decision. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Merely disputing conclusions reached or highlighting favorable evidence does not establish that the ALJ's decision was not supported by substantial evidence, or that the ALJ applied an incorrect legal standard. *See Hays*, 907 F.2d at 1456. It is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the ALJ if his decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962). Ultimately, it is the duty of the ALJ reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *Hays*, 907 F.2d at 1456 (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979) ("This Court does not find facts or try the case de novo when reviewing disability determinations."); *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We

note that it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion."); *Blalock v. Richardson*, 483 F.2d 773, at 775 (4th Cir. 1972) ("The language of § 205(g) precludes a de novo judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'").)

As discussed above, the ALJ directly cited Plaintiff's subjective statements regarding fatigue in his narrative decision. (R. at 27 ("He stated that he must lie down after only twenty minutes of mildly stimulating work such as vacuuming the floor and he naps daily for approximately two to three hours.").) The ALJ accounted for those statements when he found that Plaintiff had a mild limitation in the functional areas of concentrating, persisting, or maintaining pace and a mild limitation in the area of understanding, remembering, or applying information. (R. at 24-25.)

With regards to understanding, remembering, or applying information, the ALJ acknowledged Plaintiff's testimony that he needed reminders to take his medications and to care for his personal needs. (R. at 24.) However, Plaintiff "denied any problems paying bills, counting change, handling a savings account, or using a checkbook and money orders." (R. at 24.) Likewise, in explaining his finding with regards to concentrating, persisting, or maintaining pace, the ALJ noted that Plaintiff worked part-time as a delivery driver, reads, watches television, listens to music, plays video games, and online shops. (R. at 24-25.) Further, the ALJ cited to medical records in which Plaintiff appeared "alert and oriented with normal recent and remote memory." (R. at 25, citing R. at 489.) Finally, the ALJ noted that the state agency consultants agreed that Plaintiff had had a mild limitation in both of these areas of mental functioning. (R. at 25, citing R. at 94, 104, 120, 132.) Subsequently, the ALJ accounted for Plaintiff's mild limitations by limiting

him to "simple and routine work-related instructions and concentrat[ing] on work-related tasks for periods of two hours." (R. at 26.) The ALJ also restricted Plaintiff to performing "non-production pace/non-assembly line pace work . . . ." (R. at 26.)  A review of the record shows that the ALJ addressed relevant evidence and accounted for Plaintiff's medically determinable impairments in accordance with the regulations. As a result, the undersigned finds the ALJ did not err in his residual functional capacity determination, and substantial evidence supports his findings.

### C.  The ALJ Did Not Err in His Step Five Findings.

Lastly, Plaintiff contends that the ALJ erred in his step five finding for two reasons. (Pl.'s Mem. at 10-12.) First, Plaintiff argues that the number of available positions for the occupations identified by the ALJ is not a "significant" number, and the ALJ could not rely on them. (Pl.'s Mem. at 11-12.) Second, Plaintiff contends that the ALJ failed to account for how many jobs of the identified occupations existed in Plaintiff's region. (Pl.'s Mem. at 11 n.2.)

At step five of the sequential analysis, the burden shifts to the Commissioner to demonstrate that the claimant can perform work that exists in the national economy considering the claimant's residual functional capacity, age, education, and work experience. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The burden at step five is satisfied so long as at least one occupation is identified which exists in significant numbers in the national economy that the claimant can perform. *See Farnsworth v. Astrue*, 604 F. Supp. 2d 828, 859 (N.D.W. Va. 2009).

Work "exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country." §§ 404.1566(a). Further, work exists in the national economy "when there is a significant number of jobs (in one or more occupations) having requirements which [the claimant] is able to meet with [the claimant's] physical or mental abilities and vocational qualifications." §§ 404.1566(b). However, work that

involves only "[i]solated jobs" existing "in very limited numbers in relatively few locations outside of the region where [the claimant] live[s] [is] not considered 'work which exists in the national economy.'" §§ 404.1566(c).

The SSA has not adopted a bright line rule for a certain number of jobs to qualify as "significant" to meet the burden at step five. *Mayo v. Astrue*, No. 3:10cv866, 2012 U.S. Dist. LEXIS 33680, 2012 WL 859344, at *12 (E.D. Va. Feb. 24, 2012), *report and recommendation adopted*, No. 3:10cv866, 2012 U.S. Dist. LEXIS 33628, 2012 WL 859557 (E.D. Va. Mar. 13, 2012). As Plaintiff recognizes, the Fourth Circuit has at least alluded that as few as 110 jobs in a local economy is a significant number. (Pl.'s Mem. at 11 n.2); *Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (stating that "approximately 110 jobs testified to by the vocational expert [does not] constitute an insignificant number."); *see also Critchley v. Colvin*, No. 5:15-cv-08288, 2016 U.S. Dist. LEXIS 69773, 2016 WL 3030211, at *8 (S.D.W. Va. May 4, 2016) (finding that "100 jobs in the regional economy, even in a single occupation, constitutes a significant number of jobs"), *report and recommendation adopted*, No. 5:15-cv-08288, 2016 U.S. Dist. LEXIS 68984, 2016 WL 3033763 (S.D.W. Va. May 26, 2016). The burden at step five can be satisfied by identifying jobs that exist either nationally or in the local economy, so long as there is nothing to suggest the job would exist only in isolated locations. *McCall v. Saul*, 844 F. App'x 680, 681 (4th Cir. 2021) ("We hold that evidence of jobs existing nationally constitutes evidence of work existing in several regions of the country, at least where there is nothing in the number of jobs or the nature of the jobs identified to indicate that those jobs would exist only in limited numbers in isolated regions of the country.").

The ALJ asked an impartial vocational expert whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience, and residual functional capacity.

(R. at 32.) The vocational expert identified three occupations: (1) addresser (4,600 jobs in the national economy); (2) credit clerk (4,600 jobs in the national economy); and (3) information clerk (3,600 jobs in the national economy). (R. at 69.) The ALJ found the vocational expert's testimony consistent with the information contained in the Dictionary of Occupational Titles. (R. at 32.) Plaintiff erroneously refers to the positions in the national economy without aggregating the number of jobs cited by the vocational expert, thereby ignoring the plain text of 20 C.F.R. § 416.966. 20 C.F.R. § 416.966(b) ("Work exists in the national economy when there is a significant number of jobs (in one or more occupations.)"); *see also Frierson v. Berryhill*, 693 Fed. Appx. 660, 662 (9th Cir. 2017) (an ALJ properly aggregated three occupations to determine that a [claimant] could perform jobs existing in significant numbers in the national economy); *Lash v. Comm'r of Soc. Sec.*, No. 12-13472, 2015 U.S. Dist. LEXIS 70760, 2015 WL 3505875, at *3 (E.D. Mich. June 2, 2015) ("[C]ourts routinely aggregate numbers of jobs from different categories when determining whether available jobs exist in the national economy."); *Barker v. Sec'y of Health & Human Servs.*, 882 F.2d 1474, 1478-79 (9th Cir. 1989) (adding number of hospital laundry worker jobs to number of garment sorter jobs). Here the ALJ found Plaintiff is capable of performing occupations with approximately 12,800 jobs in the national economy. (R. at 32.)

Plaintiff encourages this Court to find that the ALJ should have calculated how many positions are available in Plaintiff's region for the identified representative occupations. (Pl.'s Mem. at 10-12.) An ALJ can satisfy his burden at step five by identifying jobs that exist either nationally or in the local economy, so long as there is nothing to suggest the job would exist only in isolated locations. *McCall v. Saul*, 844 F. App'x 680, 681 (4th Cir. 2021) ("We hold that evidence of jobs existing nationally constitutes evidence of work existing in several regions of the country, at least where there is nothing in the number of jobs or the nature of the jobs identified to

indicate that those jobs would exist only in limited numbers in isolated regions of the country."). The undersigned concludes that there is nothing in the nature of the jobs identified or in the number of jobs (addresser, 4,600 jobs nationally; credit clerk, 4,600 jobs nationally; and information clerk, 3,600 jobs nationally) to indicate that those jobs would exist only in limited numbers in isolated regions of the country.

Therefore, for the reasons stated above, the Court finds that substantial evidence supports the ALJ's step five determination that Plaintiff can perform other work that exists in significant numbers in the national economy.

## VI. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion for Remand (ECF No. 25) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 27) be GRANTED, and the final decision of the Commissioner be AFFIRMED. Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge John A. Gibney, Jr. and to all counsel of record.

### NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

Richmond, Virginia
Date: August 8, 2022

_____/s/_____
Mark R. Colombell
United States Magistrate Judge